# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| YU SAW, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | C.A. No. |
| v. | CLASS ACTION |
| THE CHEMOURS COMPANY, MARK P. VERGNANO, and MARK E. NEWMAN, | |
| Defendants. | |

## COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

*Of Counsel:*

Jeremy A. Lieberman
J. Alexander Hood II
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
Email: jalieberman@pomlaw.com
          ahood@pomlaw.com


Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
Email: pdahlstrom@pomlaw.com

ANDREWS & SPRINGER LLC

Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957
Email: pandrews@andrewsspringer.com
          cspringer@andrewsspringer.com
          dsborz@andrewsspringer.com

*Attorneys for Plaintiff*

Plaintiff Yu Saw ("Plaintiff"), by and through Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia,* counsel's investigation, which included review and analysis of: (i) regulatory filings made by The Chemours Company ("Chemours" or the "Company") and by E.I. du Pont de Nemours and Company ("DuPont") with the United States Securities and Exchange Commission ("SEC"); (ii) conference calls, press releases, and other materials issued and disseminated by Chemours and by DuPont; (iii) analyst reports concerning Chemours and DuPont; (iv) pleadings and other court filings in *The Chemours Company v. DowDuPont Inc.,* C.A. No. 2019-0351 (Del. Ch.); (v) congressional hearings and testimony from representatives of Chemours and DuPont and other witnesses concerning the facts alleged herein; and (vi) other public information regarding Chemours and DuPont.

## INTRODUCTION

1.     This is a federal securities class action brought on behalf of all purchasers of Chemours' securities between February 16, 2017 and August 1, 2019 (the "Class Period"). The claims asserted herein are alleged against Chemours and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act") and the rules promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

2. Chemours is a spin-off of DuPont and produces a wide range of industrial and specialty chemicals products for various markets. This case concerns Chemours' misrepresentations to investors that concealed the true extent of the massive environmental liabilities the Company incurred from decades of producing and releasing a variety of chemicals that have been linked to cancer and other serious health consequences by DuPont, Chemours' former parent company prior to its spin-off, and by Chemours itself. Chemours, which began trading as a public company in July 2015, was initially DuPont's Performance Chemicals division. In the spin-off, Chemours inherited all environmental and other liabilities associated with the Performance Chemicals business including, most significantly, perfluoroalkyl and polyfluoroalkyl substances ("PFAS")—toxic chemicals that have since become the basis for environmental regulatory actions, governmental prosecutions, personal injury lawsuits, and extensive remediation and other clean-up efforts.

3. Defendants have long known about the extent of environmental liabilities that have only recently been disclosed to investors. For example, when it was still DuPont's Performance Chemicals division, in the 1950s, Company scientists began documenting the health effects of PFAS; by the 1970s, they knew that PFAS was building up in the blood of humans and staying there for long periods

of time; and by the 1980s, DuPont became concerned about liver damage and birth defects among its own PFAS exposed workers.

4.     As they learned about the dangers of PFAS—which were only beginning to become known by the public at large through governmental and private litigation—DuPont executives conducted extensive internal analyses to determine how to address PFAS and what those measures would cost. For example, by 2010, DuPont's Fayetteville Works plant in North Carolina had been discharging PFAS for 30 years or more into the Cape Fear River, which serves as a source of drinking water for tens of thousands of people—a problem that DuPont internally acknowledged represented a tremendous liability. That year, DuPont internally convened a "Blue Ribbon Panel" of Company managers, scientists, and engineers to identify solutions to the problem, which ultimately suggested a $60 million investment in technology to end the discharges. Rather than adopt the Panel's recommendations, however, DuPont installed a $2.3 million gas permeator system to deal with one wastestream (out of many) responsible for certain fluorinated compounds, and terminated the rest of project in late 2013.

5.     Instead of actually addressing the Fayetteville problem, DuPont developed a plan to spin off Chemours and unload the responsibility for the vast majority of its environmental liabilities onto Chemours, including the obligation to pay for the Fayetteville exposure. These liabilities were predicated on certain

maximum amounts set by DuPont to "shift as much liability onto Chemours as possible—and, at the same time, to extract for DuPont a multi-billion-dollar dividend payment from the new company." As Chemours has now revealed, those certified maximum liabilities were deliberately and "radically" understated, and "systematically and spectacularly wrong."

6.      Chemours concealed these facts, instead marketing the spin-off by saying that its liabilities were "well understood, well-managed and related to the Chemours business." Throughout the Class Period, the Company assured investors that it was accurately reserving for its liabilities, that it was well capitalized, and that the possibility of incurring environmental liabilities greater than its accruals was "remote." Specifically, throughout the Class Period, Chemours reported that it had accrued several hundred million dollars for environmental liabilities, provided an estimate of maximum amounts of possible costs above its accruals, and reassured investors that any additional potential exposure would not be material to the Company's financial position. At the same time, the Company reassured investors regarding its environmental practices, stating that its "policies, standards and procedures are properly designed to prevent unreasonable risk of harm to people and the environment," that its "handling, manufacture, use and disposal of hazardous substances are in accordance with applicable environmental laws and regulations,"

and that it was making a good-faith effort to work with regulators and the communities surrounding its manufacturing plants.

7.    In reality, the Company's accruals were woefully insufficient and Chemours knowingly and systematically understated its known environmental liabilities exposure. As revealed in a series of disclosures—including in a confidential complaint Chemours itself filed in the Delaware Court of Chancery in May 2019 (the "Delaware Complaint") that was unsealed on June 28, 2019—Chemours reported that accrued reserves were woefully and "spectacularly" inadequate. In fact, rather than believing there is a "remote" possibility that accrued reserves would be insufficient to cover environmental liabilities, Chemours admitted in its Delaware Complaint that it currently estimates its actual exposure at over $2.5 billion—over five *times* larger than its average accruals had been during the Class Period.

8.    The truth concerning Chemours' actual exposure was revealed in a series of corrective disclosures. First, on May 6, 2019, Glenview Capital Management's Larry Robbins gave a presentation at the Sohn Investment Conference that disclosed significant new facts about Chemours' environmental liabilities, including a detailed analysis estimating the Company's true PFAS exposure was actually between $4 billion to $6 billion. In response to this disclosure, Chemours stock declined from $34.18 per share on May 3, 2019 to close at $31.61

on May 6, 2019—an over 7.5% decline that wiped out over $415 million in shareholder value.

9.      Then, on June 28, 2019, the Delaware Court of Chancery ordered the unsealing of the Delaware Complaint. Contrary to the Company's SEC filings during the Class Period, which repeatedly reported environmental accruals of under half a billion dollars and stated that the possibility that actual exposures above these amounts was "remote," Chemours alleged in detail how it in fact faced over $2.5 billion in environmental liabilities—an amount that does not even include significant new PFAS litigation exposure. As Chemours itself conceded in the Delaware Complaint, the Company's accountants did not even attempt to appropriately assess Chemours' actual PFAS litigation exposure "precisely because the liabilities were so volatile and potentially huge that it could not profitably sell the Performance Chemicals unit" if it had accurately accounted for them. In its lawsuit, Chemours sought a declaratory judgment that it was not obligated to indemnify DuPont for the full cost of environmental liabilities, or alternatively the return of the $3.91 billion dividend DuPont took when it was spun off. Significantly, Chemours is seeking the return of this nearly $4 billion pay-out on the ground that the Company's environmental exposures were so large—and its reserves so deficient—that the Company was in fact insolvent at spin-off, and thus could not be spun-off under Delaware law. In response to these disclosures, the price of Chemours stock dropped

$2.37—or nearly 10%—from $24.90 per share on June 27, 2019 to $22.53 per share on July 1, 2019, wiping out over $382 million in market capitalization.

10.     Finally, on August 1, 2019, after the close of the market, Chemours issued a press release reporting second quarter results and lowered full-year guidance, including reducing full-year free cash flow outlook to $100 million—down from prior guidance of over $550 million. In the Form 10-Q the Company filed the next day, Chemours disclosed significant increases in the Company's estimated liabilities, including numerous new legal and regulatory actions related to PFAS. Following the release of these results, analysts slashed their ratings on the Company's stock. For example, analysts at SunTrust downgraded their rating on Chemours from buy to hold, and cut their price target on the Company's stock by more than half (from $36 to $16), citing "~$2.5B for PFAS" and the liabilities revealed in the Delaware Complaint. Following disclosure of the Company's results, Chemours shares fell dramatically and closed down 19% from $18.16 per share on August 1, 2019 to $14.69 on August 2, 2019 on unusually high volume, erasing over $560 million in shareholder value.

11.     Plaintiff brings this action to recover the damages to investors caused by Defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c), and (d). Chemours is incorporated and maintains its executive offices in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### A.     Plaintiff

14.     Plaintiff purchased shares of Chemours stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.     Defendants**

15.     Chemours is a Delaware corporation headquartered in Wilmington, Delaware. At all relevant times alleged herein, Chemours traded on the New York Stock Exchange ("NYSE") under the stock symbol "CC." Chemours was formerly the Performance Chemicals business of DuPont, and began trading as a public company after its spin-off in July 2015. Chemours produces a wide range of industrial and specialty chemicals products for various markets, operating through three segments: Titanium Technologies (TiO2, a premium white pigment used for whiteness and opacity in various foods, cosmetics, and other products), Flouroproducts (flouroproducts including PFAS, as well as refrigerants), and Chemical Solutions (industrial chemicals used in gold production, industrials, and consumer applications).

16.     Defendant Mark P. Vergnano ("Vergnano") is Chemours' President and CEO. Vergnano has been the Company's President and CEO since Chemours' inception in July 2015. Prior to that, Vergnano was Executive Vice President of Performance Chemicals at Chemours' former parent company, DuPont, since October 2009.

17.     Defendant Mark E. Newman ("Newman") is Chemours' Senior Vice President and COO as of June 2019, before which Newman served as SVP and CFO starting in 2014 when he joined the Company.

| Defendants Vergnano and | Reported Accrual (in | Reported Maximum (in | Minimum Understatement |
|---|---|---|---|
| Fiscal Year 2016 | $674 | $1,209 | 52% |
| First Quarter 2017 | $1,051 | $1,531 | 39% |
| Second Quarter | $609 | $1,089 | 56% |
| Third Quarter | $281 | $791 | 68% |
| Fiscal Year 2017 | $314 | $824 | 67% |
| First Quarter 2018 | $314 | $824 | 67% |
| Second Quarter | $314 | $814 | 67% |
| Third Quarter | $336 | $806 | 68% |
| Fiscal Year 2018 | $355 | $805 | 68% |
| First Quarter 2019 | $355 | $805 | 68% |

18.    Moreover, Chemours repeatedly characterized the possibility that it would have costs higher than its accruals as listed above as "remote." For example, in its 2016 Form 10-K filed February 17, 2017, Chemours stated:

> Our remediation portfolio is relatively mature, with many of our sites under active clean-up moving towards final completion. . . . In addition, for claims that Chemours may be required to indemnify DuPont pursuant to the separation-related agreements, Chemours, through DuPont, has limited available information for certain sites or is in the early stages of discussions with regulators. . . . [T]here may be considerable variability between the clean-up activities that are currently being undertaken or planned and the ultimate actions that could be required. Therefore, considerable uncertainty exists with respect to environmental remediation costs and, under adverse changes in circumstances, *although deemed remote*, the potential liability may range up to approximately $535 million above the amount accrued at December 31, 2016.

19.    The Company repeated this statement in its Forms 10-K and Forms 10-Q filed on May 3, 2017, August 3, 2017, November 3, 2017, February 16, 2018, May 4, 2018, August 3, 2018, November 2, 2018, February 15, 2019, and May 3, 2019:

[C]onsiderable uncertainty exists with respect to environmental remediation costs and, under adverse changes in circumstances, ***although deemed remote***, the potential liability may range . . . above the amount accrued at [the end of the reporting period].

20.    The Company further represented that management did not believe that any costs of environmental remediation or litigation in excess of amounts accrued would have a material impact on the Company's financial position. For example, in the Company's 2016 Form 10-K filed on February 17, 2017 and its 2017 Form 10-K filed February 16, 2018, Chemours represented that:

> ***Management does not believe that the costs to comply with environmental requirements and the year over year changes, if any, in environmental expenses will have a material impact*** on our financial position, results of operations, or cash flows.
>
> \* \* \*
>
> ***Management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact*** on our financial position, results of operations, or cash flows at any given year, as such obligation can be satisfied or settled over many years.

21.    The Company similarly stated in its Forms 10-Q filed on May 3, 2017, August 3, 2017, November 3, 2017, May 4, 2018, August 3, 2018, and November 2, 2018 that:

> Based on existing facts and circumstances, ***management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact*** on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years.

* * *

> ***Management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact*** on our financial position, results of operations or cash flows in any given year, as such obligation can be satisfied or settled over many years.

22.     And in its 2018 Form 10-K filed on February 15, 2019 and its Form 10-Q filed on May 3, 2019, the Company stated:

> ***Management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact*** on our financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or settled over many years.

23.     In its Form 10-Q filed on May 3, 2019, Chemours added a similar statement referring to its litigation losses:

> In addition to the matters discussed below, the Company and certain of its subsidiaries, from time to time, are subject to various lawsuits, claims, assessments, and proceedings with respect to product liability, intellectual property, personal injury, commercial, contractual, employment, governmental, environmental, antitrust, and other such matters that arise in the ordinary course of business. In addition, Chemours, by virtue of its status as a subsidiary of DuPont prior to the separation, is subject to or required under the separation-related agreements executed prior to the separation to indemnify DuPont against various pending legal proceedings. It is not possible to predict the outcomes of these various lawsuits, claims, assessments, or proceedings. While management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the aforementioned proceedings, ***it does not believe any such loss would have a material impact*** on the Company's consolidated financial position, results of operations, or cash flows.

24.    The statements above in ¶¶39-45 were materially false and misleading because Chemours severely and systematically understated its actual liabilities. In addition, the statements in ¶¶40-41 describing the possibility that liabilities would be greater than accrued amounts as "remote" were false because, as Chemours has now conceded, greater liabilities are nearly certain. Specifically, in contrast to the Company's average accrual of approximately $450 million, Chemours has now admitted it faces liabilities totaling at least $2.5 billion—over five times larger than its average accruals.

25.    Further, the statements above in ¶¶42-45 that any remediation or litigation losses that exceeded the amounts already accrued would not have a "material impact" on the Company's financial position were materially false and misleading because, in reality, those liabilities were highly material.

26.    Chemours also stated in its 2017 and 2018 Forms 10-K and in every Form 10-Q filed throughout the Class Period that its liabilities related to benzene-related litigation "cannot be reasonably estimated" (even though management believed a loss was reasonably possible as to all benzene-related litigation as a whole). These statements were materially false and misleading because, in reality, Chemours could—and in fact did—estimate that liability. As Chemours alleged in the Delaware Complaint, in 2018, DuPont "provided Chemours with a . . .

comprehensive study valuing the potential maximum costs [for benzene liability] at over $111 million."

## THE TRUTH EMERGES

27.     The truth about Chemours' environmental liabilities, financial position, and environmental practices was revealed in a series of corrective disclosures.

28.     On May 6, 2019, Glenview Capital Management's Larry Robbins presented at the Sohn Investment Conference in which he disclosed significant new facts about Chemours' environmental liabilities in recommending that investors sell short shares of Chemours. Specifically, Robbins stated that Chemours faced "$4 to 6 billion" in environmental liabilities, "which is 60 to 100% of its market [capitalization]." On this news, Chemours stock declined from $34.18 per share on May 3, 2019 to close at $31.61 on May 6, 2019—an over 7.5% decline that wiped out over $415 million in shareholder value.

29.     Then, on June 28, 2019, the Delaware Court of Chancery ordered the unsealing of the Delaware Complaint which Chemours had filed against DuPont on May 13, 2019. In the Delaware Complaint, Chemours stated that, contrary to its public statements concerning the adequacy of its reserves and the unlikely and "remote" possibility that actual liabilities would exceed them, Chemours faced over $2.5 billion in environmental liabilities—a figure that Chemours had not reported in

its public filings and that Chemours stated would grow as existing litigation progressed and new lawsuits were filed.

30.     In its lawsuit, Chemours sought a declaratory judgment that it was not obligated to indemnify DuPont for the full cost of environmental liabilities, and detailed the scheme by which DuPont deliberately spun off Chemours and paid itself a $3.91 billion dividend. Specifically, Chemours alleged that DuPont sought to "shift as much liability onto Chemours as possible — and, at the same time, to extract for DuPont a multi-billion-dollar dividend payment from the new company." In doing so, according to Chemours, DuPont saddled Chemours with insufficient financial resources to pay for its actual environmental exposure by falsely certifying maximum liabilities that were deliberately and "radically" understated, and "systematically and spectacularly wrong." In fact, as revealed in the Delaware Complaint, Defendant Newman sent an email to DuPont senior management in June 2015—a month before the spin-off—pleading that Chemours needed an additional $200-300 million in cash reserves just to function on day one. But according to Chemours, "DuPont summarily rejected this plea [and] castigated him for putting the request in an email."

31.     In response to these disclosures, the price of Chemours stock dropped $2.37, from $24.90 per share on June 27, 2019 to $22.53 per share on July 1, 2019, an over 9.5% decline that wiped out over $382 million in market capitalization.

32.    Last, after the close of the market on August 1, 2019, Chemours reported its second quarter results and lowered full-year guidance, reducing the Company's full-year free cash flow outlook to $100 million down from prior guidance of over $550 million. In the Form 10-Q the Company filed the next day, Chemours disclosed significant increases in the Company's estimated environmental liabilities, including over a dozen new legal and regulatory actions related to PFAS. Following the release of these results, analysts slashed their ratings on the Company's stock. For example, analysts at SunTrust downgraded their rating on Chemours from buy to hold, and cut their price target on the Company's by more than half (from $36 to $16), citing "~$2.5B for PFAS liabilities"—a figure consistent with the liabilities Chemours conceded it faced in the Delaware Complaint. Following disclosure of the Company's results, Chemours shares closed down 19%, falling from $18.16 per share on August 1, 2019 to $14.69 on August 2, 2019 on unusually high trading volume—a 19% decline that wiped out another $560 million in shareholder wealth in a single day.

## **LOSS CAUSATION**

33.    During the Class Period, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Chemours' securities and operated as a fraud or deceit on the Class (as defined below). Later, when the truth concealed by

Defendants' prior misrepresentations and omissions was revealed to the market, including on May 6, 2019, June 28, 2019, and August 1, 2019, the price of Chemours securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Chemours' securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the securities of Chemours during the Class Period. Excluded from the Class are Defendants and their families and affiliates, and directors and officers of Chemours and their families and affiliates.

35.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2018, Chemours had 170,780,474 shares of common stock outstanding.

36.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class which predominate over questions which may affect individual Class members include:

a)      Whether Defendants violated the Exchange Act;

b)      Whether Defendants misrepresented and/or omitted material facts;

c)      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d)      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

e)      Whether the price of Chemours securities was artificially deflated;

f)      Whether Defendants' conduct caused the members of the Class to sustain damages; and

g)      The extent of damage sustained by Class members and the appropriate measure of damages.

37.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

38.    Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

39.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

18

## PRESUMPTION OF RELIANCE

40.     At all relevant times, the market for Chemours securities was an efficient market for the following reasons, among others:

a)     Chemours met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)     As a regulated issuer, Chemours filed periodic public reports with the SEC;

c)     Chemours regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)     Chemours was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for Chemours securities promptly digested current information regarding Chemours from all publicly available sources and reflected such information in the price of Chemours stock. Under these circumstances, all purchasers of Chemours securities during the Class

Period suffered similar injury through their purchase of Chemours securities at artificially inflated prices and the presumption of reliance applies.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

42.    Chemours' "Safe Harbor" warning accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

43.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Chemours who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

44.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Chemours securities at artificially inflated prices.

46.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Chemours securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

47.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

48.     During the Class Period, Defendants made the false statements specified above, which they knew to be or recklessly disregarded the truth that they were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Chemours' true condition from the investing public and to support the artificially inflated prices of the Company's securities.

50.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Chemours securities. Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Chemours securities had been artificially inflated by Defendants' fraudulent course of conduct.

51.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

52.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

53.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54.    Defendants Vergnano and Newman acted as controlling persons of Chemours within the meaning of Section 20(a) of the Exchange Act.

55.    By virtue of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Chemours' day-to-day operations during the Class Period, Defendants Vergnano and Newman had the power to and did control and influence the decision-making of the Company and the conduct of Chemours' business, including the wrongful conduct complained of herein. Defendants Vergnano and Newman were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Plaintiff alleges to be materially false and misleading. These Defendants also are duty bound to disseminate accurate and truthful information regarding Chemours' operations to correct any previously issued statements that had become untrue so that the market price of Chemours securities would be based upon truthful and accurate information.

56.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Vergnano and Newman had direct

involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations as alleged herein. Defendants Vergnano and Newman were also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Chemours during the Class Period. Further, as detailed above, Defendants Vergnano and Newman had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC. As a result of the foregoing, the Individual Defendants, collectively and/or individually, were controlling persons of Chemours within the meaning Section 20(a) of the Exchange Act.

57.    As a direct and proximate cause of Defendants Vergnano's and Newman's wrongful conduct as set forth in this Count, Plaintiff and other members of the Class suffered damages in connection with their sales of Chemours' securities during the Class Period.

58.    By virtue of their positions as controlling persons of Chemours and as a result of their own aforementioned conduct, Defendants Vergnano and Newman, collectively and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring that this action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Finding Defendants liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

C.      Finding the Individual Defendants liable for violations of Section 20(a0 of the Exchange.

D.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

E.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

F.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

ANDREWS & SPRINGER LLC

*/s/ Peter B. Andrews*

*Of Counsel:*

Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957
Email: pandrews@andrewsspringer.com
      cspringer@andrewsspringer.com
      dsborz@andrewsspringer.com

Jeremy A. Lieberman
J. Alexander Hood II
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
Email: jalieberman@pomlaw.com
      ahood@pomlaw.com

*Attorneys for Plaintiff*

Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
Email: pdahlstrom@pomlaw.com

Dated: October 31, 2019

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I,    YU SAW                                            , make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against The Chemours Company ("Chemours" or the "Company")

and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Chemours securities at the direction of plaintiffs counsel, or in order

to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a class of investors who purchased or

acquired Chemours securities during the class period, including providing testimony at deposition and trial, if

necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Chemours

securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro-rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

{00337774;1 }

8.   I declare under penalty of perjury that the foregoing is true and correct.


Executed ___10/15/2019_____
                     **(Date)**



                                        _Yaewosow_____
                                             **(Signature)**

                                        YU SAW
                                        _____
                                             **(Type or Print Name)**


{00337774;1 }

**The Chemours Company (CC)**                                                        **Saw, Yu**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 5/24/2019 | Purchase | 70 | $22.5000 |
| 7/8/2019 | Purchase | 12 | $19.8000 |
| 7/8/2019 | Purchase | 2 | $20.1000 |
| 7/10/2019 | Purchase | 1 | $19.6000 |
| 7/17/2019 | Purchase | 33 | $19.4500 |
| 7/18/2019 | Purchase | 20 | $19.2500 |
| 7/30/2019 | Purchase | 1 | $18.7000 |